**Vera HORN, Plaintiff-Appellant,**

v.

**DUKE HOMES, DIVISION OF WINDSOR MOBILE HOMES, INC., Defendant-Appellee.**

**Nos. 82–1944, 82–2000.**

United States Court of Appeals, ·Seventh Circuit.

Argued Dec. 5, 1984.

Decided Feb. 26, 1985.

Motion to Alter or Amend Dismissed May 13, 1985.

James D. Stevens, Elkhart, Ind., for plaintiff-appellant.

William J. Cohen, Elkhart, Ind., for defendant-appellee.

Before ESCHBACH and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

Vera Horn, the prevailing plaintiff in the Title VII action below, appeals from the district court's refusal to award her back pay. The defendant, Duke Homes, Inc. ("Duke"), a division of the Indiana corporation Windsor Mobile Homes, Inc., cross-appeals from the district court's finding that it was liable for sex-based discrimination against Horn. We affirm the district court's finding of liability and reverse its denial of back pay.

I

On May 5, 1980 Horn was discharged from her employ as a factory worker for Duke, a manufacturer of mobile homes. After receiving notice of right to sue from the EEOC, Horn filed suit alleging that she was terminated because of her refusal to respond to the sexual advances of Duke's plant superintendent, Frank Haas, and that her right to refuse such advances was protected by Title VII of the Civil Rights Act of 1964, *codified as amended* at 42 U.S.C. §§ 2000e–2000e–17 (1982). After a bench trial, the district judge entered judgment for Horn.

At trial Horn testified that she was forty-seven years old and began her employ with Duke in August 1979. Transcript of Proceedings at 18 (hereinafter cited as "T."). She was hired by Frank Haas, T. 21, who after a few months began to make sexual advances, T. 21–22. The advances took the form of leers, T. 22, 34, obscene gestures, T. 34, 37, lewd comments, T. 31, 32, 35, remarks about her sexual needs now that her husband had left her, T. 31, 36, and promises that he would make it

"easy" for her at Duke if she would "go out" with him, T. 25, 30, 36. Horn rejected these advances, T. 31, 36, the last of which occurred two weeks before her discharge, T. 35–36. Shortly after the last rejection, Haas orally reprimanded her for substandard work, T. 49–50. Following the reprimand, the first she had ever received during her tenure at Duke, Horn was transferred to another section of the production line for approximately one week, T. 21–35, 49–54. Then, she was abruptly called into Haas' office and terminated, T. 54.

Horn attempted to corroborate her testimony in two respects. First, Hans Nast, a former employee of Duke, testified that he overheard Haas tell Horn "to the effect that if she would get together with him she wouldn't have to work so hard." T. 89. Second, Horn introduced the testimony of three former female employees of Duke to establish Haas' propensity to use his power at Duke to sexually exploit women who were vulnerable because of marital problems and financial dependency on their jobs.

Leanna Miller testified that Haas physically compelled her to have oral sex with him, T. 108. She was divorced at the time, T. 109, and subsequently began an affair with Haas' brother in part because she believed it would make it "easier" for her at Duke, T. 111–12, a motive that also eventually caused her again to have sexual relations with Haas at the factory, T. 114–15.

Pattie King testified that shortly after she separated from her husband, she took a job with Duke, T. 118–19. After a few months, Haas commented about her single status and made sexual advances, which King refused, T. 120–22. Following this incident, Haas consistently began to walk into King in order to brush up against her breasts, T. 122–23. When she asked for a raise in order to support her children and furnish her home, Haas stated that all she had to do was to "cooperate" with him, T. 124–25. King threatened to "put him in his place with a weapon," T. 126, but eventually decided, instead, to leave her job, T. 127.

Anita Loomis testified that while an employee at Duke, she had an affair with Haas, T. 137. The affair was voluntary and lasted approximately two years, T. 137–39.

Duke introduced several witnesses who testified that Horn was unable to perform her job satisfactorily, T. 164–65, 173, 197–98, 204, 210. Haas testified that he discharged Horn because of complaints about her work. T. 223–25. Although he had given her two merit raises to reward her for good work, T. 247–49, Haas believed that Horn's marital problems caused an abrupt decline in her job performance, which led to her termination, T. 222–24. Haas denied making sexual advances to Horn and King, T. 227, 257, but he admitted that he asked Horn to have a drink with him and other Duke employees, T. 237. Haas also admitted having sexual relations with Miller and Loomis, although he asserted that both relationships were uncoerced, T. 229–30.

Howard Lesher, Haas' supervisor, testified that, immediately after her termination, Horn complained to him about Haas' behavior, T. 269–70. After investigating the charges, he concluded that Horn was terminated because her personal problems prevented her from performing her job satisfactorily, T. 270–72. Lesher asserted that Haas normally had absolute authority to hire and fire the employees Haas supervised without consulting him, T. 280. Although it was the company's policy to terminate only for good cause, Lesher conceded that it was Haas who had the authority to determine whether that standard had been met, T. 280–81. Lesher asserted, however, that neither he nor the company condoned sexual harassment of its employees, T. 273.

The district judge reasoned that the case hinged on a simple credibility determination and concluded that Haas' testimony was not credible. T. 314–15; *see also* Finding of Fact No. 5. Not only did Haas make sexual advances toward Horn, but sexual harassment characterized "the totality of his relationship with women in the plant." T. 316; *see also* Finding of Fact No. 5

(Horn's testimony was credible and corroborated by testimony of Nast, Miller, and King). The complaints about Horn's performance were "thin" and "belated" and, consequently, the employer failed to show any legitimate cause for Horn's termination. T. 316, 319. Accordingly, the district judge concluded that Horn had proven by a preponderance of the evidence that consent to Haas' sexual advances was a condition of employment and that such a condition violated Horn's Title VII rights. Conclusion of Law No. 3.

The remedy ordered by the district judge was to assess "front pay" at $48.00 per day from the date of judgment until the date of Horn's eventual reinstatement and $3,000 in attorney's fees. The district judge expressly refused to award back pay. T. 320–21. He reasoned that he enjoyed "discretion" with respect to this issue, T. 320–21, and that the record was "just not adequate" for the award to be made, T. 320.

## II

■ We turn first to the district court's finding of liability. Duke challenges no finding of fact.[1] Rather, it argues that it is entitled to judgment as a matter of law because the district judge found that the supervisory hierarchy above Haas neither knew nor approved of Haas' sexual misconduct. Appellee's Brief at 16. In addition, Duke somewhat cryptically challenges Horn's premise that Title VII protects an employee's right to refuse to submit to sexual relations as a condition of employment. *See id.* at 14 (alluding to cases where sexual harassment was successfully challenged as not stating a cause of action).

■ We hold that Title VII prohibits an employer, acting through one of its supervisory employees, from imposing sexual consideration as a condition of employment.[2] Although it is true that other doctrinal vehicles can be used to remedy the type of wrong committed by Haas,[3] sexual consideration constitutes precisely the kind of "artificial, arbitrary, and unnecessary barrier[ ] to employment," that Title VII was intended to prevent. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91

1. Duke does challenge the district court's findings of fact on the ground that they did not "properly discuss the burdens of proof required in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ]". Appellee's Brief at 17. Duke does not specify further.

We assume *arguendo* that this argument properly raises the issue that the district court misapplied the *Burdine* standards and that such misapplication caused it to reach the wrong result. The district court correctly concluded that Horn made a *prima facie* case of sex discrimination. T. 319. Such a burden is not onerous, and Horn satisfied it by showing she was discharged under circumstances that raised an inference of unlawful discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. We believe that Duke successfully rebutted the presumption of discrimination created thereby by producing evidence that Horn was discharged for cause. Duke's evidence did not have to persuade the court, it simply had to raise a genuine issue of fact. *Id.* at 254–55, 101 S.Ct. at 1094–95. It is clear that the court recognized this, *see* T. 309 (quoting *Burdine* ). The court, however, found Duke's rebuttal evidence to be completely devoid of credibility. *See* T. 315–19. Therefore, its implicit conclusion was that viewing the evidence as a whole, Horn had succeeded in proving that Haas' legitimate reasons for discharging her were pretextual, and that she had in fact been terminated because she refused his sexual advances. *See* Conclusion of Law No. 3.

We refuse to hold that the district court was required either to make this last conclusion explicit or to render a detailed dissection of the *Burdine* standards and their application to the facts at bar. Our view of the record convinces us that the district court properly applied the *Burdine* standards and made factual findings that were not clearly erroneous.

2. We express no opinion as to whether an employer may be held liable under Title VII for sexual harassment instigated by the plaintiff's co-employees. *See, e.g., Barrett v. Omaha National Bank,* 726 F.2d 424 (8th Cir.1984); *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981).

3. *See, e.g., Lucas v. Brown & Root, Inc.,* 736 F.2d 1202, 1204–05 (8th Cir.1984) (employer's demand that employee-at-will sleep with him as a condition of employment states a tort claim under Arkansas law; such a condition is tantamount to prostitution, and therefore the employee's dismissal is void as against "public policy").

S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). But for Horn's womanhood, Haas would not have demanded sex as a condition of employment. *Accord Barnes v. Costle,* 561 F.2d 983, 990 (D.C.Cir.1977). Because of her sex, therefore, Horn was disadvantaged by pressure to submit to an additional, humiliating condition of employment that served no legitimate purpose of the employer. Her right to refuse this condition was protected by Title VII. The cases holding to the contrary have been repudiated,[4] and our holding is in accord with that of every circuit that has reached the issue.[5]

We also decline Duke's invitation to require "actual or constructive knowledge of a supervisor's conduct and failure to take remedial action before holding an employer liable for sexual harassment involving tangible job detriment." Appellee's Brief at 16. Such a requirement may be necessary in those cases where the plaintiff is sexually harassed by his or her co-employees, *see, e.g., Bundy v. Jackson,* 641 F.2d 934 (D.C. Cir.1981), though we need not decide that issue in this case, *see supra* note 2. But with respect to the discriminatory acts of supervisory employees, Duke's position finds no support in either precedent or policy.

Every circuit that has reached the issue has adopted the EEOC's rule imposing strict liability on employers for the acts of sexual harassment committed by their supervisory employees:

> Applying general Title VII principles, an employer, ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence....

29 C.F.R. § 1604.11(c);[6] *accord Henson v. City of Dundee,* 682 F.2d 897 (11th Cir. 1982); *Bundy,* 641 F.2d at 947; *Miller v. Bank of America,* 600 F.2d 211 (9th Cir. 1979). Although the Third Circuit originally suggested that actual or constructive knowledge of the employer might be appropriate, *see Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044, 1048–49 (3d Cir.1977), that circuit has recently repudiated such a requirement, *see Craig v. Y & Y Snacks,* 721 F.2d 77, 80 (3d Cir.1983).[7]

The policy justification Duke advances is that "sexual harassment is an intentional act done for private gratification.... How can a company be held responsible for such actions unless it is notified of them?" Appellee's Brief at 16. We disagree. First, Duke's reification of the "company" invites an ill-advised descent into the world of le-

---

**4.** *E.g., Tomkins v. Public Service Electric & Gas Co.,* 422 F.Supp. 553 (D.N.J.1976), *rev'd,* 568 F.2d 1044 (3d Cir.1977); *Miller v. Bank of America,* 418 F.Supp. 233 (N.D.Cal.1976), *rev'd,* 600 F.2d 211 (9th Cir.1979).

**5.** *Henson,* 682 F.2d 897 (11th Cir.); *Miller,* 600 F.2d 211 (9th Cir.); *Tomkins,* 568 F.2d 1044 (3d Cir.); *Barnes v. Costle,* 561 F.2d 983 (D.C.Cir. 1977); *Garber v. Saxon Business Products, Inc.,* 552 F.2d 1032 (4th Cir.1977) (per curiam); *cf. Barrett,* 726 F.2d 424 (8th Cir.) (sexual harassment by co-employees actionable under Title VII).

**6.** Appellee's argument that we should not apply these regulations retroactively is without force. The *ex post facto* clause does not apply in civil contexts. *See Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954). In any event, we are not bound by the EEOC's rules; we are bound only to give some deference to the EEOC's rulings as the product of a "body of experience and informed judgment." *General*

*Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). In the case at bar, we adopt the EEOC's rule because we find its judgment both persuasive and supported by precedent.

**7.** Although the Third Circuit did not overrule *Tomkins* or repudiate the rhetorical standard adopted in that case, it redefined the "constructive" knowledge component in a way that allowed the court to shift from a fault-based liability standard to one of strict liability. The court reasoned that where the supervisor has "unbridled authority to retaliate against an employee," the employer has "constructive notice" of the harassment, and is therefore subject to Title VII liability. *Craig,* 721 F.2d at 80–81. The court then cited with approval the strict liability rules of the other circuits. *Id.* at 81.

gal fiction. The "company" is a legal form; it can "act" only through its duly-appointed agents. Where, as here, the supervisory employee is given "absolute" authority to hire and fire, *see supra* at 3–4, and uses this authority to extort sexual favors from employees, the supervisor *is*, for all intents and purposes, the company.

Second, courts have long used the doctrine of *respondeat superior* to impose liability on principals for the intentional torts of their agents. *See generally* W. Prosser, *The Law of Torts* §§ 69–70 (1971). The reasoning behind this rule is rarely articulated, though the more modern cases tend to rely on a risk allocation theory: the employer, not the innocent plaintiff, should bear the cost of the torts of its employees as a required cost of doing business, insofar as such torts are reasonably foreseeable and the employer is a more efficient cost avoider than the injured plaintiff. *E.g., Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167 (2d Cir.1968) (Friendly, J.); *see generally* W. Prosser, *supra*, at § 69 p. 459; Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499, 543–45 (1961). Thus, the answer to Duke's question, "How can a company be held responsible for such [discriminatory] actions unless it is notified of them?" is that sex discrimination can best be eradicated by enforcing a strict liability rule that ensures compensation for victims and creates an incentive for the employer to take the strongest possible affirmative measures to prevent the hiring and retention of sexist supervisors. *Cf. Calabresi, supra,* 70 Yale L.J. at 500–07, 514–17 (goods produced by entrepreneurs who do not assume the costs of remedying a tort (in this case sexism) are artificially cheap; forcing them to internalize the costs of the tort regardless of fault eliminates incentives to be sexist and ensures proper allocation of societal resources).

■ Duke attempts to invoke the limiting principle that *respondeat superior* does not apply where the agent acts outside the scope of his employment. Appellee's Brief at 16. An agent acts outside the scope of employment where his conduct is either not "of a kind he is authorized to perform" or not "actuated, at least in part, by a purpose to serve the principal." *Restatement (Second) of Agency* §§ 228(1)(a), (c) (1958). It could be argued that because Haas was not authorized to discriminate on the basis of sex and because his sexual proclivities were wholly unconnected to the well-being of the employer, he was acting outside the scope of his employment. On the other hand, by delegating power to Haas the "employer" and Haas essentially merged; as long as the tort complained of was caused by the exercise of this supervisory power, Haas should be deemed as acting within the scope of his employment, and the employer should be held liable for the tort. *See supra* at 8. Furthermore, the same risk allocation policies that have been used by modern courts to justify broad *respondeat superior* liability also justify limiting the scope-of-employment exception. *See, e.g., Bushey,* 398 F.2d at 170–72.

■ Third, whatever the result under the common law of agency, Title VII demands that employers be held strictly liable for the discriminatory employment decisions of their supervisory personnel who are delegated the power to make such employment decisions. *See, e.g., Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir.1977); *see generally* Development, *New EEOC Guidelines on Discrimination Because of Sex: Employer Liability for Sexual Harassment Under Title VII,* 61 B.U.L.Rev. 535, 538–45 (1981); Note, *Sexual Harassment and Title VII: The Foundation for the Elimination of Sexual Cooperation as an Employment Condition,* 76 Mich.L.Rev. 1007, 1025–30 (1978). It was Congress' judgment that employers, not the victims of discrimination, should bear the cost of remedying and eradicating employment discrimination. The strict liability rule is admirably suited for this purpose. Indeed, courts have applied the rule without hesitation in every Title VII context except sexual harassment. *See generally* Development, *supra,* 61 B.U.L.Rev. at

540; Note, *supra,* 76 Mich.L.Rev. at 1025. A different rule for sex discrimination would be contrary to Congress' finding that "discrimination against women is no less serious than other prohibited forms of discrimination," [8] and, now that earlier sexual harassment cases have been repudiated, contrary to all viable precedent.

■ We therefore adopt the EEOC's strict liability rule codified at 29 C.F.R. § 1604.11(c). Applying that rule to this case, we note that Duke does not question either Haas' supervisory power or the exercise of that power to sexually harass Horn.[9] Accordingly, we affirm the district court's finding of liability.

### III

■ The second issue presented is Horn's appeal from the district judge's denial of back pay. With regard to the district judge's assertion that he had "discretion" on this issue, T. 320, we note that "Congress' purpose in vesting a variety of 'discretionary' powers in the courts [in ordering Title VII damages] was not to limit appellate review of trial courts, or to invite inconsistency and caprice, but rather to make possible the 'fashion[ing] [of] the most complete relief possible.'" *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280

(1975). Because a denial of back pay undercuts Congress' directive to afford the plaintiff "complete relief," back pay must be awarded unless "special factors" are shown; such special factors "usually include only circumstances where state legislation is in conflict with Title VII." *Stewart v. General Motors Corp.,* 542 F.2d 445, 451 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *see, e.g., Le Beau v. Libbey-Owens-Ford Co.,* 727 F.2d 141, 149–50 (7th Cir.1984). No "special factors" were shown in the case at bar.[10] Accordingly, the district court did not have "discretion" to deny back pay.

■ On the other hand, the plaintiff has the burden of proving the damages caused her. These damages are determined by "measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant." *Taylor v. Philips Industries, Inc.,* 593 F.2d 783, 786 (7th Cir.1979) (per curiam). In *Taylor,* this court reversed an award of back pay where the plaintiff failed to introduce any evidence of actual earnings subsequent to her discharge. By reasoning that the instant record was "even less adequate" than that made by the plaintiff in *Taylor,* T. 320,

---

**8.** S.Rep. No. 92–415, 92d Cong., 1st Sess. 7 (1971). The report accompanied the Equal Employment Opportunity Act of 1972, which amended Title VII.

**9.** Duke does question what type of sexual harassment the district court found. *See* Appellee's Brief at 18. Duke apparently suggests that instead of finding that Haas demanded sex as a condition of employment, the district court may have simply found that the sexual harassment consisted of sexual advances that created an intolerable atmosphere, but which did not cause her dismissal. Such an argument ignores the district court's express finding that Haas demanded sex as a condition of employment. *See* Conclusion of Law No. 3. Duke would have us ignore this finding on the grounds that the plaintiff drafted it for the court. Appellee's Brief at 17. We believe that Horn faithfully reported the gist of the district court's oral findings, *see* T. 315–19.

**10.** Duke's contention that the district court's "equitable discretion" allowed it to refuse to award

back pay on the grounds that the company did not know of or condone Haas' misconduct is without merit. *See* Appellee's Brief at 12. As we noted in *Stewart,* 542 F.2d at 451, the "special factors" justifying a denial of back pay "do not include the fact that the employer lacked specific intent to discriminate and therefore arguably was operating in good faith." Also without merit is Duke's argument that "there were no facts in the record proving that Horn lost her job as a result of Haas' sexual harassment." Appellee's Brief at 11–12. This is essentially an attempt to re-litigate the liability issue by re-defining it as an issue of damages. The district court did not commit clear error in noting the absence of a "smoking gun" but inferring a causal connection between Horn's rejection of Haas and her termination from the testimony of Horn, Nast, Miller, and King as well as from the absence of credible evidence as to a legitimate cause for termination. *See* T. 318–19; Finding of Fact No. 5.

the district court implicitly held that Horn failed to discharge her burden of proof on this issue.[11] We review such a factual finding not for an abuse of discretion, but for clear error. *See Albemarle,* 422 U.S. at 424, 95 S.Ct. at 2374.

In *Taylor,* the plaintiff testified that she was unable to find "comparable employment" after her wrongful discharge; the record was completely silent as to whether she received any wages from non-comparable employment, which must be deducted from earnings she would have accrued had she remained in the defendant's employ in order to arrive at the appropriate figure for back pay. *See Taylor,* 593 F.2d at 787. In the case at bar, Horn testified in detail as to her activities after her termination. She worked forty hours per week at a plant in Bristol for approximately twelve weeks at $4.50 per hour, T. 58. She received $130.00 in unemployment compensation, T. 58–59.[12] She did some babysitting, housecleaning, and sewing, T. 59. And she applied for other jobs without success, T. 59. As for her compensation had she remained at Duke, Horn testified that she earned $6.00 per hour and, given fluctuations in Duke's labor needs from week to week, worked an average of thirty-two hours per week, T. 56–57.[13] She was termi-nated on May 5, 1980; judgment was entered in her favor on May 10, 1982, two years and five days later.

This evidence was sufficient to allow a finder of fact to calculate a reasonable estimate of the harm suffered as a result of Horn's termination. Simple multiplication yields a weekly salary of $192.00. Since exactly 105 working weeks elapsed from the date of termination to the date of judgment,[14] Horn would have earned $20,-160.00 had she remained at Duke. Leaving aside for the present Horn's unspecified earnings from babysitting, housecleaning, and sewing, Horn mitigated her damages by accruing a total of $2,290.00 after she left Duke. Subtracting these "interim earnings"[15] from Horn's projected earnings at Duke, we arrive at a net damages figure of $17,870.00 that could have been awarded as back pay. The calculation is not precise, but unrealistic exactitude is not required in this context and "ambiguities in what an employee ... would have earned but for the discrimination should be resolved against the discriminating employer." *Stewart,* 542 F.2d at 452. The district court's conclusion that the record was insufficient to permit a reasonable calculation of back pay was clearly erroneous.

---

**11.** Even assuming the district court correctly concluded that the plaintiff had failed to introduce adequate evidence of damages, this court's holding in *Taylor* did not necessarily require the draconian decision to deny any back pay. In *Taylor,* the court instead remanded for further factfinding on the issue. *Taylor,* 593 F.2d at 787.

**12.** Horn concedes that it is appropriate to deduct unemployment compensation from wages foregone at Duke in arriving at a back pay figure. *See* Appellant's Brief at 13. The propriety of such a deduction is an issue that has split the circuits. *See generally Craig,* 721 F.2d at 81–82. We have upheld the propriety of such a deduction in the past. *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 721 (7th Cir.1969). We hold that Horn has waived her right to challenge the viability of this precedent.

**13.** In ordering $48.00 per day front pay, the district court apparently assumed that Horn worked eight hours per day at $6.00 per hour. That would translate to forty hours per week, assuming a five-day week. However, the dis-trict court did not specify whether the front pay should be awarded each calendar day or each working day, and, consequently, it did not make any findings with respect to Horn's weekly hours. The only evidence in the record on this issue is Horn's rough approximation that she worked thirty-two hours per week. *See* T. 56.

**14.** We can take judicial notice that exactly 735 calendar days elapsed between Horn's termination and the judgment in her favor. It is not clear from the record, however, exactly what days should be counted as working days. Resolving all ambiguities in favor of Horn, as we must, *see Stewart,* 542 F.2d at 452, we simply divide 735 by 7 and arrive at a figure of 105 working weeks.

**15.** "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g) (1982).

Given Horn's presentation of sufficient evidence to permit a reasonable estimate of damages to be awarded as back pay, the burden shifted to Duke to rebut Horn's evidence or to show Horn's failure to take reasonable efforts to mitigate her damages by finding additional employment. *See Taylor*, 593 F.2d at 787. Because Duke failed to introduce any such evidence on this issue, Duke waived any objection to basing a back pay calculation on Horn's evidence.[16] The district court erred in refusing to make such a back pay calculation.

In sum, elementary arithmetic and substantial, uncontested evidence permit us to find as a matter of law that the appropriate back pay award was $17,870.00 less the amount Horn earned from babysitting, housecleaning, and sewing. We do not believe that Horn's failure to approximate the amount of her earnings from these latter activities should defeat the award of any back pay. First, it could reasonably be inferred that these activities yielded only nominal income and that, therefore, the $17,870.00 was itself a reasonable estimate of damages and sufficient to discharge plaintiff's burden on this issue. Second, Duke could have elicited the necessary information on cross-examination or could have brought the lack of evidence on this issue to the attention of both the court and Horn in its motion for directed verdict. Third, we should not reward the tortfeasor by requiring unreasonable exactitude from the plaintiff, and we should resolve ambiguities against the former. *Taylor*, 542 F.2d at 452.

As in *Taylor*, we believe the appropriate course of action is to remand for further factfinding. *See supra* note 11. In order to enforce the waiver of various issues by both sides, however, the sole issue on remand is to determine the approximate amount of Horn's earnings from babysit-

ting, housecleaning, and sewing. After calculating this figure, the district court is directed to deduct it from $17,870.00 and to order the difference as back pay.

The district court's finding of liability is affirmed. Its denial of back pay is reversed, and the cause is remanded for further proceedings consistent with this opinion. Circuit Rule 18 shall not apply.

---

16. We therefore reject Duke's suggestion at oral argument that we remand for further factfinding on the issue of whether Horn's back problems would have prevented her from working the full 105 weeks at Duke had she not been terminated. The only evidence in the record on this issue is Horn's passing reference to her difficulty in retaining her job at Bristol because it entailed work that was too heavy in view of her "back problem." T. 58. Duke could have cross-examined Horn about her back and could have used a variety of means to establish the cause and nature of her back problem. It waived its right to do so.